Filed 12/22/15  In re Robin Y. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re ROBIN Y.,<br><br>a Person Coming Under the Juvenile Court Law. | B251969<br>(Los Angeles County<br> Super. Ct. No. CK65704) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>M.Y.,<br><br>    Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Reversed and Remanded.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

Mother M.Y. appeals from the juvenile court's jurisdictional order under Welfare and Institutions Code section 300, subdivision (b),[1] regarding her son, Robin, and the later disposition order. At the contested jurisdiction hearing, the court found that Mother repeatedly made false allegations that Father and his girlfriend physically and sexually abused Robin. Based on this finding, the court sustained one count of the dependency petition, which alleged under section 300, subdivision (b), that Mother's allegations, which resulted in Robin being repeatedly interviewed by law enforcement and others and subjected to physical examinations, endangered Robin's physical and emotional well-being. Later, at the disposition hearing, the court terminated jurisdiction, giving Father sole custody, and granting Mother monitored visitation.

Mother contends that: (1) the sustained count of the dependency petition was facially deficient and does not support dependency jurisdiction; (2) the evidence does not support a finding that Robin was at risk of serious physical harm under section 300, subdivision (b), based on Mother's false allegations that Father and his girlfriend abused Robin; (3) the court erred in concluding that there was no reasonable alternative to removing Robin from Mother's custody; (4) the evidence does not support the court's order that Mother's visitation be monitored; and (5) the order terminating jurisdiction should be reversed, because it is in Robin's best interest for Mother to have joint custody.[2]

We conclude that the evidence is insufficient to support jurisdiction under section 300, subdivision (b), because there is no evidence to support a finding that

---

[1] All further section references are to the Welfare and Institutions Code.

[2] These contentions are raised in Mother's supplemental opening brief, filed by appointed counsel. Before counsel was appointed, Mother filed an opening brief in pro. per. We do not consider the issues raised in that brief.

Robin has suffered, or is at substantial risk of suffering, serious physical harm. Therefore we reverse the jurisdiction order, and the subsequent disposition order and exit order terminating jurisdiction. That disposition renders moot Mother's remaining contentions. Because the juvenile court expressly found that Mother was "abusing her son and causing him tremendous emotional strain," we remand the case to permit DCFS to consider filing a new petition to allege (among any other appropriate allegations) that jurisdiction may be asserted under section 300, subdivision (c). Because circumstances might have changed during the pendency of this appeal, those circumstances must be considered by the court in evaluating any new petition.

## BACKGROUND

*Previous Dependency History*

Robin was born in October 2006. Before the instant case (which arose in 2013), the Los Angeles County Department of Children and Family Services (DCFS) had received four referrals involving Robin.

The first, in November 2006, alleged that Mother's erratic behavior made her unable to care for Robin. An investigation substantiated an incident of domestic violence (mother slapped Father and Father pushed mother while she was pregnant). The juvenile court assumed jurisdiction, and after six months of reunification services, Robin was returned to the parents, who are not married and live apart. The court entered a family law order awarding joint custody to both parents, with each parent having visitation on alternating weeks.

The second referral occurred in February 2008, when Robin was 16 months old. An anonymous reporting party alleged that Father sexually abused Robin. DCFS investigated, and determined the allegation to be unfounded.

3

The third referral occurred in January 2011, when Robin was four years old. In that referral, Mother reported that Father's girlfriend, Susan, had sexually abused Robin. The Pasadena Police Department investigated the allegation, and reported that Mother alleged Susan digitally penetrated Robin's anus, and strangled and slapped him. A medical evaluation by a sexual assault nurse revealed "no overwhelming evidence to indicate sexual or physical abuse." Robin had a small anal tear that was consistent with constipation. When first interviewed, Robin said that Susan had "touched his butt," but he gave no further information. In a second interview, he would not discuss the incident. The investigating officer, Sergeant Robert Tucker, concluded that no crime had been committed, and that Robin had been coached by Mother to report the alleged abuse. The District Attorney declined prosecution because of the "extremely limited evidence."

The fourth referral, in May 2013, alleged neglect by Father. DCFS assessed both parents' homes and deemed them appropriate.

*Current Case*

The instant case began in July 2013, when mother took Robin (then 6 years old) to the Alhambra police station, where Robin told a police officer that Father had slapped him 100 times, that Father had inserted his penis into his rectum, and that Father's girlfriend Susan had inserted her fingers into his rectum.

A DCFS caseworker interviewed Robin. She observed two small scratches to his left cheek and a bruise below his cheekbone. Robin said that he received the injuries when his Father slapped him 100 times for breaking a plate. He also stated that on the previous day, Father had slapped him 50 times, and Susan had done so 25 times, because he was dirty.

4

With regard to sexual abuse, Robin said that on two separate days (determined to be June 23 and 26, 2013), Father had inserted his penis in Robin's rectum. He said Father had done this many times in the past. He also claimed that "a long time ago" Susan had urged him to lick Father's penis and to lick her "wee wee," and that Susan had licked Robin's penis.

Robin also said that Father took him to CVS and Walgreen stores to steal candy, and that Father stole some candles.

*Relevant Witness Interviews*

The caseworker spoke to other relevant witness: Mother, Father, Susan, and the investigating officer for the Alhambra Police Department.

When interviewed by the case worker, Mother said that when she retrieved Robin from Father's home to begin her visitation, she noticed swelling, scratches, and bruises on Robin's face. In the car, she asked Robin what had happened. Robin reported that Father slapped him 100 times (according to Mother, Robin counted the slaps) and that Father had put his penis in Robin's anus. Mother believed that Father had been sexually molesting Robin since he was 10 months old. She had made a past report of sexual abuse to the Pasadena Police Department (referring to the 2011 investigation), but the police believed that she had made a false accusation.

Mother expressed fear of Father. She claimed that Father had broken into her house on several occasions. He once asked Robin to open the door to let him in so he could steal some of Robin's jeans. On another occasion, Father broke into her house while holding Robin in order to steal "evidences from" Mother.

When interviewed, Father stated that the scratches and bruising on Robin's face were caused when Robin was running and fell into some boxes at Father's

5

warehouse. He denied that he or Susan physically or sexually abused Robin. Susan likewise denied engaging in or witnessing any physical or sexual abuse. Father claimed that Mother was emotionally unstable and coached Robin to make the accusations.

The caseworker spoke to Detective Marissabel Orozco of the Alhambra Police Department, who had interviewed Robin when Mother brought him to the station. The Detective believed that Robin might have exaggerated the number of times Father struck him, but also believed that Father had indeed abused him.

*Forensic Examinations*

Because the alleged abuse occurred in Pasadena, the criminal investigation was transferred to the Pasadena Police Department, which referred Robin for a sexual abuse examination. The exam was inconclusive. The examining nurse observed an anal tear and bruises on Robin's body. However, she concluded that the injuries "may be caused by sexual abuse or other mechanism." Later Robin was examined at Los Angeles County USC Medical Center. The examining nurse was unable to do a full forensic examination because of the previous exam. The nurse observed tears around Robin's anus, but noted that the tears could be from the previous exam.

*Further DCFS Investigation*

The case worker interviewed Robin again. Robin reiterated his claim that Father had slapped him 100 times, and that Susan had also slapped him. He also said that Susan removed his pants and inserted her finger into his rectum; later Father inserted his penis into his rectum and "peed."

6

DCFS continued to investigate the accusations, but the evidentiary picture remained largely constant. Robin continued to say that Father put his penis in his rectum; Father and Susan continued to deny any physical or sexual abuse.

*The Operative Section 300 Petition*

In July 2013, before the jurisdictional hearing, DCFS filed the amended section 300 petition on which the jurisdiction hearing was held. The petition contained 11 counts, which sought to cover the range of sometimes confusing and inconsistent evidence.

Counts a-1 and a-2 (serious physical harm under § 300, subd. (a)), and counts b-1 and b-2 (failure to protect under § 300, subd. (b)), alleged that Father and Susan physically abused Robin, and that Mother failed to protect him.

Counts b-3 and b-4 (failure to protect under § 300, subd. (b)), and counts d-1 and d-2 (sexual abuse under § 300, subd. (d)) alleged that Father and Susan had sexually abused Robin, and Mother had failed to protect him.

Count b-5 alleged under section 300, subdivision (b), that Father engaged in theft and caused Robin to engage in theft.

Count b-6 alleged under section 300, subdivision (b), that "[o]n prior occasions 2011 and 2013 . . . [Mother] placed [Robin] . . . in a detrimental and endangering situation in that the mother made numerous allegations of physical and sexual [abuse] of the child by his Father . . . and by Father's female companion. [Mother's] accusations resulted in the child being repeatedly interviewed by law enforcement, DCFS social workers, other professionals, and subjected to invasive sexual abuse examinations. Such conduct by the mother endangers the child's physical and emotional health, safety, and well being and places the child at risk of physical and emotional harm and damage."

Count b-7 alleged under section 300, subdivision (b), that Mother had mental and emotional problems that rendered her incapable of caring for Robin.

*Jurisdiction Hearing*

The jurisdiction hearing was held over three days in 2013: July 30, August 12, and September 27. The court received into evidence, among other documents, the DCFS reports, photographs taken by the Alhambra Police Department, and handwritten letters by Robin. The court heard testimony from four witnesses: Mother, Sergeant Robert Tucker of the Pasadena Police Department, Detective Marissabel Orozco of the Alhambra Police Department, and Robin.

*Mother's Testimony: July 30 and August 12, 2013*

Mother testified on July 30 and August 12, 2013.

Regarding her reports that Father had taught Robin how to open Mother's door, had broken into her home several times in the past, and had done so on one occasion while holding Robin in order to steal evidence, Mother testified that she did not witness the incidents. Rather, Robin had told her about them. As to the incident in which Father stole evidence, Robin, who was then six-years-old, had told her the time the break-in occurred (11:00 p.m. or 12:00 midnight) and that Mother was snoring at the time.

Similarly, Mother had no personal knowledge that Father had caused Robin to steal things. Instead, Robin told her that on February 7, 2011, Father stole toys and trains and changed labels on items. When she confronted Father, he denied stealing.

As to Mother's belief that Father had physically and sexually assaulted Robin, Mother had not sought a restraining order against Father, because "[she]

8

talked to [an] attorney, but the attorney said it's not established because you don't have evidence. You cannot put a restraining order against anyone just because what you think. You have to provide evidence." Similarly, she had not applied for sole custody in the family law court, because when the case "end[ed] [up] in this court, . . . I thought that was the end of the case. And I didn't have anything, any evidence to provide the family court to get . . . custody."

Asked about Robin's claims of sexual abuse, Mother testified that from 2008 to 2013, Robin told her that Father and Susan sexually abused him. She had made two or three reports of sexual abuse to the police. Beginning in 2011, Robin also told her that Father and Susan physically abused him.

Mother made the most recent report of abuse after Robin told her several times that Father had slapped him 100 times. Despite Robin's claims, Mother did not seek sole custody because "[e]very time I report it, the results was [*sic*] unfounded. No result at all. And I was threatened by [a] Pasadena Police Officer. She said if you keep on reporting and no result, then if you put your son into [an] abusive situation, we can take you son away from you. I am very scared in either way. And I have no evidence if the police officer said no evidence. Whatever my son reported to me, was in vain. Then if I go to family court, they are going to say you are here for money . . . [b]ecause I have no evidence at all."

On most occasions when Robin returned from Father's home, Mother took photos of Robin and kept them in the hard drive of her computer. She also made journal entries, recording the times and locations she picked him up or dropped him off, and noting any injury. She had not provided the journal to the police, because someone broke into her house and stole it. Similarly, she had not provided the photographs to the police, because she had left her computer in which she stored the photos in a suitcase at a friend's house. The friend moved, and when

9

Mother retrieved the suitcase in June 2012, it was empty. Since the loss of the computer, she had taken other photos of Robin with a camera. She kept the photos on a flash drive at home, but had not provided them to the police.

*Sergeant Robert Tucker's and Detective Marissabel Orozco's Testimony – August 12, 2013*

Sergeant Robert Tucker of the Pasadena Police Department testified on August 12. He had investigated the 2011 sexual abuse allegations regarding Robin, and had supervised the officer who investigated the current 2013 allegations. He was also aware of the investigation of the 2008 allegations. Regarding the 2011 investigation, Sergeant Tucker concluded that no crime had been committed, and that Robin had been coached by Mother to report the alleged abuse. Sergeant Tucker "felt that the child was kind of being prompted. . . . His Mom kept trying to . . . tell him to tell me what you told me about this . . . which was kind of prompting the child to make certain responses." The officer who investigated the current 2013 allegations under Sergeant Tucker's supervision reached the same conclusion: Mother had coached Robin.

Detective Marissabel Orozco, a sex crimes investigator with the Alhambra Police Department, also testified on August 12. She was the investigating officer when Mother first brought Robin to the Alhambra Police Department to report the current 2013 allegations. She observed Robin's face was swollen and bruised, and that he had been crying. While Robin was being treated for those injuries, Mother whispered to Detective Orozco that Robin had said Father put his penis in Robin's butt. Detective Orozco interviewed Robin privately, out of Mother's presence. Robin told her that Father touched his penis and penetrated his butt. He said that

10

the bruising to his face was caused when Father slapped him 100 times because he had broken a plate.

Based on Robin's demeanor and ability to give details, Detective Orozco believed Robin's allegations. However, she conceded that she did not ask Robin about specific details, such as where the abuse occurred or whether it occurred during the day or night.

*Last Minute DCFS Report Dated September 27, 2013*

Robin was scheduled to testify on September 27, 2013. In a last minute report filed with the court on that date, DCFS reported that during a monitored visit on September 18, 2013 between Mother and Robin, the monitor observed mother whisper to Robin in an apparent attempt to coax Robin away. The monitor followed up on her suspicion later in the car with Robin. When Robin denied that Mother had whispered anything to him, the monitor threatened to report to the social worker that he and Mother were lying. She then asked, "Did your mother coach you?" Robin asked what coaching was. The monitor said, "Forget it. I'm not talking with you anymore." After a pause, Robin said that his mother did coach him. The monitor asked what Mother coached him to say. Robin said, "to say my dad hit me." The monitor asked if his father had hit him, and Robin replied no. The monitor then asked, "What else?" Robin replied, "That he touched me." The monitor prompted Robin to explain what he meant by touching. She asked, "like put his privates on you[?]" Robin answered yes. Robin said that his father had not done that, but "My mom said if I didn't say that I wouldn't get to play with my toys."

11

Robin was adamant, however, that Father had stolen candy from the store and milk from Starbucks. Father's criminal record search revealed that father had three petty theft convictions, occurring respectively in 2000, 2007, and 2009.

When informed of the September 18 visit, the caseworker interviewed Robin by telephone. Robin denied that Father had ever abused him and said that Mother had taught him what to say.

On September 25, 2013, two DCFS investigators interviewed Robin, who said that his claim of abuse was a "misunderstanding." According to Robin, he told Mother that he had fallen down at Father's warehouse, but Mother did not believe him and thought that Father had struck him. Robin stated that when he went to the doctor, there was a "scratch" where he "go[es] poo. . . . [Mother] thought he did something; touched me. Bad touch." When asked if his initial report of sexual abuse was true, Robin stated, "I think it's not true anymore. Like my dad touched me. It's not true anymore. . . . He didn't do it. I said it by accident." Regarding his initial claim that Father slapped him, Robin said, "My mom thought that but it's not true. My mom said she would kick me out of the house if I don't tell the truth. It was a misunderstanding."

*Robin's Testimony – September 27, 2013*

After the filing of the last minute report, Robin testified on September 27, 2013. He was asked about five letters he had written that were admitted into evidence. The letters, dated between March 7 and July 2, 2013, recounted alleged incidents in which Robin stole a Lego from another child, stuffed toilet paper into the toilet bowl because Susan told him to, stole a hula hoop, opened the door to Mother's home for Father and Susan to enter, and practiced opening Mother's door at Father and Susan's direction. Robin admitted writing the letters, but said that

12

Mother made him write the letters and that the incidents were not true. He denied to Mother that he had ever opened the door to Mother's home to let Father in, but Mother did not believe him.

Regarding alleged physical abuse by Father, Robin denied that Father slapped him 100 times. He stated: "My Mom thinks Dad hits me because . . . my face was like a little red because I fell down at my Dad's warehouse where I was playing around." When Robin told Mother that Father hit him, he told her "by mistake." Regarding his earlier claim that that Susan hit him, he stated that Mother "made me say that." Robin explained that he told Mother things that were not true because "she makes me, so I had to tell the lie." She made him tell lies because "she said that she won't talk to me forever if I don't tell the truth and like she will kick me out of the house."

As to the allegations of sexual abuse, Robin denied that Father or Susan ever did anything to him that he did not like. Although he had told the police and caseworker that Susan and Father had put their fingers in his butt, he said that because Mother told him to say that. Mother never told him to "tell the policeman the truth." Rather, she said "to tell the policeman a lie." She also did not tell him to tell the truth to the social worker.

Asked whether Father had told him to tell the truth, Robin replied, "Yeah," and added that he did not think that Father knew Mother was lying.

*The Parties' Argument*

At the conclusion of the evidence at the jurisdiction hearing, counsel for DCFS briefly argued that the evidence established two counts of the petition under section 300, subdivision (b): count b-5, alleging that Father caused Robin to commit a theft, and count b-6, alleging that Mother made allegations of physical

13

and sexual abuse, resulting in Robin being repeatedly interviewed and examined, and that Father failed to protect him. As to the remaining counts, counsel for DCFS observed that there was conflicting evidence, and submitted to the court's determination.

Next, Mother's counsel argued that Robin was not a reliable witness in his testimony, but was "trustworthy" in his "statements over time" recounting sexual and physical abuse by Father and Susan, and in his statements that Father had made him steal things. Mother's counsel urged that the counts against Father be sustained, and the counts against Mother be dismissed.

Father's counsel argued that the evidence established Mother had coached Robin to make all the allegations against Father, and urged that the petition be dismissed in its entirety as to Father.

Robin's counsel urged the court to dismiss all counts except b-6. She argued that the evidence established that Mother had coached Robin to make allegations of sexual and physical abuse. She also argued that Father had failed to protect Robin, by failing to bring the false allegations to the attention of the family law court.

*The Court's Findings*

In its ruling, the juvenile court dismissed all counts of the petition except b-6. It amended that count to delete the reference to Father's failure to protect. As sustained, count b-6 alleged: "On prior occasions 2011 and 2013 . . . [Mother] placed [Robin] . . . in a detrimental and endangering situation in that the mother made numerous allegations of physical and sexual [abuse] of the child by his Father . . . and by Father's female companion. [Mother's] accusations resulted in the child being repeatedly interviewed by law enforcement, DCFS social workers,

14

other professionals, and subjected to invasive sexual abuse examinations. Such conduct by the mother endangers the child's physical and emotional health, safety, and well being and places the child at risk of physical and emotional harm and damage."

Explaining its findings, the court stated that Mother's testimony "was very telling," insofar as she "testified that she had gone to the police many, many times, but there was no result. And the reason why there was no result [was] because, quote, she had no evidence. She testified she never went to family court to get a restraining order against the father even though she believed that the child was being physically and sexually abused. She did say that she consulted with an attorney; however, this attorney, also, told her that she had no evidence."

Further, the court "found Robin to be one of the smartest, most articulate soon-to-be seven-year-olds I have ever heard. This court found Robin to be credible." The court concluded that Robin was very attached to Mother, and thus when "Mother says, if you don't tell me something, I'm not going to let you come home or speak to you. He's going to do what she says because that's what little kids do. He was very clear: Mom made me write things. He was very clear: Dad never did this to me. Dad never hit me. Dad never sexually abused me. Dad's girlfriend never sexually abused me. But Mom has continued to coach me. He didn't say the word 'coach'." In short, Mother "makes him tell lies and tells him that she won't talk to him and kick him out of the house, if he doesn't. . . . There is no question in my mind that while [Mother] may love her son, it is she who is abusing [him] and causing him tremendous emotional strain."

As to Father, the court dismissed all counts because he had "done everything he could within his power to deal with someone who has been constantly making false allegations against him."

15

The court found Robin to be a child described by section 300, removed him from Mother's custody, placed him in Father's custody, ordered services for both parents, and ordered a psychological examination of mother under Evidence Code section 730 to aid the court in fashioning an appropriate disposition.

*Mother's Psychological Evaluation*

An initial evaluator expressed concern that Mother might have a mental disorder (though it was difficult to tell because of her dishonesty). A full evaluation was performed by Dr. Steve Ambrose, a psychologist. In his report dated March 25, 2014, Dr. Ambrose concluded that Mother suffered from depression and anxiety, but was not Bipolar or otherwise mentally ill. Regarding Mother's accusations that Father and Susan sexually abused Robin, Dr. Ambrose concluded that it was very unlikely that Robin had been abused, but that it was also likely that Mother actually believed that such abuse occurred.

In his report, Dr. Ambrose wrote in relevant part:

"I must acknowledge that I have not met or interviewed any other parties to this case besides the mother. If I were to meet with other parties my views could potentially be influenced. With this caveat, given the testimony of the minor in Court, the absence of any further reports of sexual abuse since the father has had full physical custody, evidence of the mother's distorted thinking and the low likelihood that [Father] and his female companion would have begun sexually abusing Robin as an infant, I am strongly disinclined to believe that Robin has ever been sexually molested by either his father or his father's girlfriend. While I cannot definitively rule out the possibility that [Mother] deliberately coached her son to make allegations that she knew were false, I also do not think that this is the most likely scenario. There is no evidence that [Mother] has exhibited this kind of

16

manipulative, antisocial behavior in the past.  To the contrary, she appears to be very concerned about social propriety and following social conventions.  That leaves the third possibility – that she genuinely, but mistakenly, suspects that [Father] molested their son.  Assuming this third possibility, the questions then become what would cause her to have these unfounded suspicions and how did she influence her son to support them.

"During her three interviews . . . and in her [test] responses, [Mother] presented as highly anxious and ruminative and the [test] results suggested that she is suffering from an Anxiety Disorder.  She focused on minor, irrelevant details and worried obsessively about how she responded to some of the test items.  In a similar fashion, I suspect that she became hyper-vigilant about possible signs of sexual abuse, ruminated obsessively, convinced herself that something suspicious was occurring and began looking for further evidence to confirm her suspicions.  Thus, she interpreted painful bowel movements as evidence of sexual abuse, inspected her son's diapers and took pictures of him every time he returned from a visit with his father.  Even during this evaluation, she brought in a picture of a girl posted on the Facebook site of [Father]'s adult daughter and seemed to think that this seemingly innocuous picture was evidence of something sinister.  In this instance, her perspective seemed distorted and even somewhat paranoid.

"This apparent paranoid trend in her thinking does not appear to be of psychotic proportions. . . .  Her suspiciousness is probably better understood as a personality trait and a function of her high level of anxiety and tendency to ruminate.

"Once [Mother] convinced herself that Robin had been molested, I suspect that she needed to hear confirmation from Robin that her suspicions were valid and that she pressured him to tell her what she mistakenly believed to be the truth.  She

17

had been looking for signs of sexual abuse since he was an infant and, no doubt, influenced his perceptions of reality. She was the dominant figure in his world and he may have even been confused himself about whether his father had abused him.

"Even though I am inclined to believe that she genuinely suspected wrongdoing by [Father], I do not doubt that she wanted to keep Robin for herself and for the two of them to be extricated from the shared custody arrangement with [Father]. In this sense, her suspicions may have been consistent with other motives besides just concern for her son.

"With respect to visitation, there have already been concerns that [Mother] has tried to have secret communications in Chinese with Robin during visits. [In a report dated March 26, 2014, the visitation monitor reported that during a visit Mother had whispered something to Robin. Robin later confirmed that fact to the caseworker. When the caseworker confronted Mother, Mother denied the incident and requested that the monitor be changed or all visits be videotaped. ] [Mother] counters that speaking Chinese with Robin is something special that they share. No doubt this is true, but I am not convinced that she would refrain from trying to influence Robin's thinking again, were she able to have unmonitored communication. My recommendation is that their contacts continue to be supervised, and that conjoint therapy be initiated during which there can be some frank, supervised discussion with a skilled therapist about the history of allegations in this family. I would like to see Robin reassure his mother that he has never been molested by his father and [Mother] reassure Robin that she will discontinue reporting child abuse and pressuring him to confirm her suspicions. This will require considerable preparation for both Robin and his mother, prior to these conversations. It will be important, too, that Robin have a neutral therapeutic

18

setting where he can discuss his relationships with both parents and test reality if his mother begins to burden him again with her suspicions."

*Review Hearing*

On May 1, 2014, the court held a review hearing under section 364. The court received Dr. Ambrose's report into evidence, as well as the DCFS report prepared for the hearing, dated March 26, 2014. In that report, DCFS stated that Robin, now seven-years-old, was attending therapy to help regulate his anxiety and anger, so that he can follow directions without negotiation and angry outbursts. Father was attending parenting classes, and was an active participant in group learning and discussion.

Mother was also attending parenting classes, and had demonstrated good progress in taking care of herself and her son. However, she continued to deny that she coached Robin to make accusations about Father, and still believed that Father had abused Robin. According to the monitor for mother's visitation, on January 2, 2013, the monitor heard Robin admonish Mother, "whispering is not allowed during the visit." Robin later told the monitor that Mother was whispering to him. When confronted by the case worker about the incident, Mother denied it.

Robin loved both parents and wanted to resume the prior alternating weekly visitation schedule. Nonetheless, because Mother had placed Robin in a detrimental situation and continued to believe abuse had occurred, DCFS recommended that Father be granted sole legal and physical custody of Robin, with Mother to receive two hours of monitored visitation.

At the hearing, the court also heard limited testimony from Mother, who stated that in her three meetings with Dr. Ambrose, she had difficulty understanding him because there was no Mandarin interpreter and that she was

19

concerned for Robin because while in Father's custody he had lost weight, his hair was white, and his face was pale and red as if he was wearing makeup.

Mother's counsel argued that the current and past proceedings unfairly targeted Mother for having reported Father's abuse of Robin. She urged the court to "either retain jurisdiction and start focusing on father where the focus should be, or alternatively, to restore [Mother] to joint physical and legal custody." Counsel for DCFS, Father and Robin, respectively, argued that the court should terminate jurisdiction, grant Father sole legal and physical custody, and order monitored visitation for Mother.

*The Court's Ruling*

Following the hearing, the court took the matter under submission, and later issued a statement of decision, in which the court ordered that Father have sole legal and physical custody, with twice weekly monitored visitation for mother. The requirement of a monitor was not to be lifted until Mother, Father, and Robin engage in family counseling, and until Mother can cease making false accusations and being hyper-vigilant of Robin. Whether the monitoring requirement would be lifted was a matter to be determined by the family court.

## DISCUSSION

We have discussed the complicated procedural and evidentiary history of this case at length in order to do justice to the difficulties faced by the parties and the court, and to put in context our disposition of this appeal. However, our explanation of that disposition will be brief, because a fundamental error occurred in the court's assertion of jurisdiction.

20

Mother contends that the evidence was insufficient to prove that Robin suffered or was at substantial risk of suffering serious physical harm under section 300, subdivision (b). Therefore, the jurisdictional order must be reversed. We agree.

In relevant part, section 300, subdivision (b) describes a child who has suffered, or who is at substantial risk of suffering, "serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." As this court recently stated in *In re Jesus M*. (2015) 235 Cal.App.4th 104, 111-112: "[A]ppellate courts have repeatedly stressed [that] '"[s]ubdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness."'" [Citations.] Nonetheless, we are repeatedly called on to review jurisdictional findings where, as here, one parent has behaved badly, undeniably causing family trauma, but presents no obvious threat to the children's physical safety. There was evidence to suggest the children were suffering emotionally, but rather than allege emotional abuse under subdivision (c) of section 300, DCFS asserted jurisdiction under subdivision (b)."

The present case is such a case. Viewing the entire record in the light most favorable to the juvenile court's orders, and drawing every reasonable inference in support (*In re. Marina S.* (2005) 132 Cal.App.4th 158, 165), we find no substantial evidence –indeed, no evidence whatsoever – that Mother's eliciting false allegations from Robin that he was physically and sexually abused, and Mother's making such allegation herself, caused Robin serious physical harm, or placed him

21

at substantial risk of serious physical harm. In explaining its resolution of the conflicting evidence, the juvenile court did not find that Robin had suffered or was at risk of suffering serious physical harm. Rather the court found that Mother was "abusing her son and causing him tremendous emotional strain." But such a finding of emotional damage cannot support jurisdiction under section 300, subdivision (b). It might support jurisdiction under section 300, subdivision (c), which provides in relevant part that jurisdiction is appropriate when "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian." But no such count was alleged in the petition, and the court would have erred had it amended the petition to allege such a count without notice to Mother and an opportunity to be heard. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1042, fn. 14 [observing that if a petition alleged jurisdiction under § 300, subd. (d), because the child reported sexual abuse by a parent, but the juvenile court did not believe the child, an amendment to allege jurisdiction under § 300, subd. (c) "based on the idea that any child who would make such allegations, even if false, has obviously been subject to emotional abuse," would be an improper "way to establish dependency without giving the parent adequate notice of dependency jurisdiction under an emotional abuse theory"].)

DCFS contends that Mother's eliciting multiple reports of abuse from Robin, thereby subjecting him to ongoing interviews and invasive physical examinations, is a proper basis for jurisdiction. In support, DCFS cites two decisions, *In re A.J.* (2011) 197 Cal.App.4th 1095, 1098-1100 (*A.J.*), and *In re Heather A.* (1996) 52 Cal.App.4th 183, 195 (*Heather A.*). Neither decision is applicable. In *A.J.,* the mother's false reports that Father abused her were used to assert jurisdiction over

22

the child based on the child's emotional damage under section 300, subdivision (c), not based on the risk of serious physical harm under subdivision (b). In *Heather A.*, the court upheld jurisdiction under section 300, subdivision (b), because the parents' domestic violence placed the children at substantial risk of serious physical harm ("they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg" (*id.* at p. 194)) even though the violence was not directed at them. This principle has no relevance here.

DCFS argues that the risk Mother will subject Robin to repeated unnecessary and invasive sexual assault examinations is sufficient in itself to prove a substantial risk of serious physical harm. However, there is no evidence in the record to suggest that the nature of such examinations create a substantial risk that Robin might suffer serious physical harm as result. DCFS appears to argue that the invasiveness of the examinations alone is sufficient to satisfy section 300, subdivision (b). But without some additional evidence explaining how the invasiveness of the examination translates into a substantial risk of serious physical harm, invasiveness is not sufficient to support a finding that Robin is at risk of serious physical injury. In short, there is no basis for jurisdiction in the instant case under section 300, subdivision (b).

Our determination that the evidence does not support jurisdiction under section 300, subdivision (b), requires that we reverse not only the jurisdiction order, but the subsequent disposition orders and the exit order terminating jurisdiction. We remand the case to the juvenile court for further dependency proceedings. "Our conclusion that the sustained allegations of the petition do not support jurisdiction does not mean the DCFS cannot try again. Indeed, it is entirely possible valid grounds exist for the state to assume jurisdiction over these children and indeed it may be in the children's best interests for this to happen."

(*In re Janet T.* (2001) 93 Cal.App.4th 377, 392.) Here, the court specifically found that Mother's conduct caused Robin "tremendous emotional strain." Therefore, on remand, DCFS may consider whether to file a petition alleging jurisdiction under section 300, subdivision (c), as well as any other appropriate allegations of jurisdiction. If such a petition is filed, the court must consider any new circumstances that have occurred during the pendency of this appeal in determining whether grounds for jurisdiction exist.[3]

---

[3] We note that Mother also contends that the evidence does not support a finding that Robin's allegations of abuse were false, or that Mother in any way acted improperly in eliciting and reporting such allegations. However, on the record of the jurisdiction hearing, and given the juvenile court's credibility finding that Robin was telling the truth at the hearing, that point is, frankly, not even arguable. To be clear, we reverse the jurisdiction finding solely on the basis that Mother's conduct did not cause Robin to suffer serious physical harm or place him at substantial risk of suffering such harm. Nonetheless, the trial court's factual findings that Robin's allegations of abuse were false, and that Mother was responsible for his making such false allegations, were clearly supported by substantial evidence.

## DISPOSITION

The jurisdiction and disposition orders, and the exit order terminating jurisdiction, are reversed. The case is remanded to the juvenile court. On remand, DCFS may consider whether to file a petition alleging jurisdiction under section 300, subdivision (c), as well as any other appropriate allegations supporting jurisdiction. If such a petition is filed, the court must consider any new circumstances that have occurred during the pendency of this appeal in determining whether grounds for jurisdiction exist.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.

COLLINS, J.

25